**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | **INDICTMENT NO.** |
| ) | **1:10-CR-352** |
| **v.** ) | |
| ) | |
| **JOHN DENNIS TAN ONG,** ) | |
| ) | |
| **Defendant.** ) | |

## SENTENCING MEMORANDUM OF JOHN ONG

COMES NOW, Defendant John Dennis Tan Ong, through undersigned counsel, and respectfully asks this Honorable Court to impose a sentence of no more than 21 months and to consider the following prior to imposing sentence:

## I.  Guideline Calculations

The Government, Probation and Mr. Ong all agree that the appropriate guideline for the offense is § 2M5.2, the base offense level pursuant to that guideline is 26, and Mr. Ong should receive a reduction of 3 levels for acceptance of responsibly pursuant to § 3E1.1.

### a.  Mr. Ong should be given a minor role adjustment

Mr. Ong was a minor participant in the criminal activity and should receive a 2 level minor role adjustment under § 3B1.1(b).  Mr. Ong received no compensation or other direct benefit for his role in the offense.  See *United States v. Haut*, 107

F.3d 213 (3d Cir. 1997) (finding that co-defendants in an arson case qualified for a four-level reduction as minimal participants, where one co-defendant removed items from the location prior to the fire and participated in family gatherings at which the arson was discussed and the other co-defendant was present when the arson was discussed, yet neither took an active role in the actual burning or benefited financially from its occurrence).  Mr. Ong's only motivation was a desire to create good will with the co-defendant Rivera, who was a customer of Mr. Ong's legitimate automobile export business.

Furthermore, Mr. Ong is less culpable than the co-defendant Rivera.  Rivera sought to purchase the items for himself, initiated the contact with the agent, provided the money for the items, coordinated every step of the attempted purchase, and along with the Agent courted Mr. Ong to ship the items.  Mr. Ong did not actively seek involvement in the conspiracy.  Every action taken by Mr. Ong was in response to a request from Rivera or the Agent.  Once Mr. Ong realized that there were export controls on the items, he refused to ship them.  Mr. Ong's involvement in the conspiracy was limited to acting as go-between the Agent and Rivera, forwarding the funds from Rivera to the Agent, and giving advice on how the agent could ship the items to Rivera in the Philippines.

With an additional 2 level downward adjustment for minor role, Mr. Ong's guidelines would be at a level 21 with a custody range of 37-46 months before departures for substantial assistance.

### b. Departure for substantial assistance.

Mr. Ong has fully cooperated with authorities in this matter. On November 30, 2011 the Government filed a motion for downward departure pursuant to § 5K1.1. Mr. Ong requests the Court depart downward 2 levels pursuant to § 5K1.1, leaving Mr. Ong's guidelines at a level 19 with a custody range of 30-37 months.

## II.   § 3553(a) factors

The § 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, (B) to afford adequate deterrence to criminal conduct, (C) to protect the public from further crimes of the defendant, and (D) to provide the defendant with needed educational or vocational training or medical care; (3) the kinds of sentences available; (4) the Sentencing Guidelines range; (5) pertinent policy statements of the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; (7) and the need to provide restitution to victims. *See* 18 U.S.C. § 3553(a)(1)-(7).

### a. 18 U.S.C. § 3553(a)(2)(A): the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

Mr. Ong requests the Court impose a reasonable sentence under § 3553(a) of 21 months. As explained below such a sentence is sufficient, but not greater than necessary to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

### b. 18 U.S.C. § 3553(a)(1) the nature and circumstances of the offense.

Several aspects of the Mr. Ong's offense conduct support the imposition of a reasonable sentence below the guideline range. Mr. Ong received no compensation or other direct benefit for his role in the offense. Mr. Ong's only motivation was to create good will with the co-defendant Rivera, who was a customer of Mr. Ong's legitimate automobile export business.

Additionally, Mr. Ong did not intend to violate the law when he first agreed to ship the parts. When Ong agreed to assist in exporting the gun parts to the Philippines he was unaware that his conduct would be in violation of the law. Mr. Ong was asked by Ronnel Rivera, a client of Mr. Ong's legal automobile export business, to assist Rivera in shipping some gun parts from a seller that Rivera had previously purchased parts though off e-bay. *See* e-mail from Rivera to Ong on September 14, 2009. (Exhibit A). Mr. Ong assumed that since the parts could be

4

purchased off e-bay that there would be no problem shipping them to the Philippines.  Mr. Ong knew that the e-bay seller might be prohibited from selling outside the Untied States by the seller's own agreement with the manufacturer. Mr. Ong did not anticipate that shipping guns parts to the Philippines was prohibited by U.S. law.  When Mr. Ong agreed to facilitate the sale he was not doing so with the intent to violate the laws of the United States.

There are 2 emails from Mr. Ong's e-mail account, predating Mr. Ong's involvement with the charged conspiracy,  that seemingly indicate that Mr. Ong was aware that U.S. law prohibited the export of gun parts to the Philippines.  Mr. Ong was informed in an e-mail on November 23, 2010 that, "[t]his model of the EOTech sight is not to be exported or sold out of the country, according to both U.S. law and my contract with EoTech".  *See* Email from Stuart Smith to Ong on November 23, 2010. (Exhibit B).  While Mr. Ong must have received this e-mail, he has no memory of realizing that the export was prohibited by U.S. law.  Either Mr. Ong never read the e-mail or he skimmed it on his blackberry and only retained the portion regarding the manufacturer prohibition.

Additionally, Mr. Ong wrote an e-mail on January 24, 2009 which read; "[t]here is only one problem we cannot tell them we are exporting the stuff out of the country … There is an Anti-Export ban on the parts." *See* e-mail from Ong to

Richard Go on January 24, 2009. (Exhibit C).  In this e-mail the ban to which Mr.

Ong refers is the ban imposed by the manufacturer, which prevents the seller from

selling the items outside of the country.   Mr. Ong was not referring to a ban

imposed by United States law, as he was unaware of such a ban at the time.

Once Mr. Ong learned that export of the items was prohibited by U.S. law

Mr. Ong attempted to withdraw from the conspiracy.  In a telephone conversation

with the Undercover Agent on December 4, 2009 Mr. Ong learned that shipping

the parts to the Philippines would be prohibited by U.S. law.  At that point Mr.

Ong refused to ship the items.  *See* transcript of call between Ong and the Agent on

December 4, 2009. (Exhibit D).

A = Agent / JO = John Ong

| A | Well, yeah it's kind of bulky but there's a lot of controls on these things and we talked about that before, I mean, ah, you know, I don't want to know, you know, about the export licensing and all that kind of crap but, you know, I don't want it – there's even controls inside the U.S. on this stuff so I don't want it sitting around anyplace so, you know, as soon – let me know when the shipment is scheduled to go and I'll ship it to you, you know, a couple of days before it's ready to leave |
| JO | ***Oh there's controls on them? I didn't know that****. um,* |
| A | Yeah |
| JO | Okay. Alright. Um, okay let me try and – I'll talk to Renel first and I'll ask him, you know, exactly, because ***if there's controls on them I can't ship it with my stuff****,* you know, or else, you know, cause if something happens then the whole container is, you know, seized, you know. You know what I'm saying? |

………….

| JO | The parts are okay right? The parts are – ***there's no restriction on parts right you know*** |
|----|----|
| A | Well yeah you're supposed to have an export license for it. You know, we had talked about it before that. The ITAR crap. |
| JO | ***You mean even like, let's say, accessories for it?*** You need to ah -- |
| A | Yeah, well these are, these are like receivers and ah, and the big thing I'm worried about is the suppressors. You're supposed to have a FFL for the suppressors. |
| JO | Really |
| A | Yeah. |
| JO | ***So everything is controlled then. In that case I can't – I won't be able to ship it for him.*** All the items are the special requirements for it? Is that what you're saying |
| A | Well, everything I think should have an export license. Um, but the suppressors have some even additional issues with them. You're not even supposed to be transferring those. I'm not supposed to be transferring those to individuals without the appropriate ATF stamps |
| JO | ***Really*** |

Mr. Ong's goal in refusing to ship the items was to avoid getting involved in what he had come to realize was illegal activity.  However, despite this attempt to remove himself from the situation, Mr. Ong nonetheless continued to facilitate the sale.  Rivera sent Mr. Ong the money to pay for the items and Mr. Ong forwarded those funds to the Agent.  Mr. Ong also gave advice to Rivera on how to ship the items out of the country in a way to avoid detection by immigration.  Mr. Ong understands that in committing these acts he knowingly and willingly participated in a conspiracy to violate the Arms Export Control Act.

**c.   18 U.S.C. § 3553(a)(1) the history and characteristics of the defendant.**

John Dennis Tan Ong, 38 years old, was born in Manila, Philippines.  Mr. Ong's parents still live in the Philippines.  His father, Bun Giok Ong, is 67 years old and owns his own lighting business.  Mr. Ong's mother, Rosalinda Ong, is 63 years old and works with her husband.  Mr. Ong has one sister, Vivian Ho, age 39, who lives in Vancouver, Canada, and owns a furniture store, and one brother, Dexter Tan Ong, age 35, who lives in the Philippines, and works in his parent's business.

Mr. Ong and his family lived in the Philippines until they moved to Canada in 1985 when Mr. Ong was twelve years old.  In 1991, Mr. Ong became a Canadian citizen.  Mr. Ong married Pauline Arcinas on August 30, 2004 in Manila, Philippines. Mrs. Ong currently resides in Vancouver, Canada, where she is employed as a registered nurse.

Mr. Ong has a strong and consistent work history.  From 1995 through 2003, he owned an automobile customizing and detailing business, Red Line Racing, in Vancouver, Canada. From 2003 through 2007, Mr. Ong was employed with his sister, Vivian, at her furniture store, Domani Interiors, in Canada.  From 2007 up to the time of his arrest, Mr. Ong owned and operated an automobile export company, Cathay Auto Export, which exported cars to clients in Turkey, Hong Kong and the Philippines.  Mr. Ong's work history demonstrates his strong work ethic, which

8

coupled with his family support will allow Mr. Ong to successfully reintegrate into Canadian society once he is released.

Mr. Ong is a true first offender. He does not have any prior arrests, charges or convictions. Mr. Ong also stands before the Court as a man of exemplary character. Attached as Exhibit E are letters from the following friends, family and business associates of Mr. Ong; Pauline Ong (soon to be ex-wife), Vivian Ho (sister), Daniel Ho (brother-in-law), Jesus Domingo (business associate), Karen Jew (family friend), Si Huynh (family friend), Lawrence Vanderven (business associate), Dr. Achilles Liato (family friend), Marina T. Eliazo (family friend), Michelle Kishimoto (sister-in-law), Joseph Ho (father of Mr. Ong's Brother-in-law), and Rosalind Ong (mother). These letters describe Mr. Ong as a man who is honest, trustworthy, giving, loyal and devoted to his work. They describe a man who is always willing to help others, and giving of himself to a fault. Mr. Ong is devoted to his work and has always dealt with others in a fair and honest manner. (Exhibit E). The friends and family upon who Mr. Ong has given his love, energy and generosity are the very same people who will be a stabilizing force as Mr. Ong rebuilds his life going forward.

However, Mr. Ong's family life has been irrevocably damaged due to Mr. Ong's offense conduct. Due to the stress of Mr. Ong's incarceration, the

uncertainty in his future, and the near impossibility for visitation, Mr. Ong and his wife are getting divorced.  The loss of this relationship, his marriage to his best friend, has devastated Mr. Ong emotionally.  Additionally, Mr. Ong has lost both his business and his home.

Mr. Ong has fully cooperated with authorities in their investigation of the crime, laying out in detail the progression of events during the commission of the offense.   This level of openness and willingness to cooperate demonstrates Mr. Ong's desire to take responsibility for his actions and genuine contrition for violating the law.

Mr. Ong has been in custody for over a year since his arrest on September 17th, 2010.  We ask that the Court take into consideration the length of time Mr. Ong has spent in the restrictive conditions present at the Robert A. Deyton pre-trial detention center in Lovejoy, GA (Lovejoy), in comparison to a the conditions of confinement post-sentencing at a Federal Bureau of Prisons (BOP) facility. Normally, an inmate at a BOP facility can work, has freedom of movement within the institution, can participate in various educational programs and has almost unlimited physical activity during normal hours.  In comparison pre-trial detainees at Lovejoy cannot attend classes.  They are held within their pods for 23 hours and allowed one hour a day for physical activity.  In most respects an inmate at

Lovejoy is like an inmate in a lockdown situation in a penitentiary which is a condition instituted within the institution for the purpose of punishment.  Serving time as a pretrial detainee is more exhausting mentally, emotionally and physically because of the lack of choices of what to do with yourself, which leads to boredom and the feeling that time goes more slowly and is much harder to endure.

The lengthy, dreary and depressing conditions present during pre-trial confinement are a sufficient basis for a downward departure and reasonable sentence below the guideline range. See, *U.S. v. Pressley*, 345 F.3d 1205 (11th Cir. 2003) (where defendant spent six years in presentence confinement, of which five years were in 23-hour a day lockdown and where he had not been outside in five years, district court erred in holding that departure not available).  While Mr. Ong's near 15 months in pre-trial confinement are less than the six years from *Pressley*, those 15 months represent more than a quarter of the sentence that the guidelines, as set forth in the PSR, would recommend for Mr. Ong.

This difficulty of incarceration for Mr. Ong is further enhanced by the fact that this is his first offense.  The difficulty for someone who has never been arrested, to suddenly be thrown into custody, locked down 23 hours a day, not knowing how long it will be before he is free, simply cannot be underestimated.

The location of Mr. Ong's loved ones further enhances the difficulty of the time Mr. Ong has served and will continue to serve.  All of Mr. Ong's loved ones are in Canada.  The only comfort of family Mr. Ong has had during his time at Lovejoy is one 30 minute visit from his soon to be ex-wife.  Furthermore, while Mr. Ong will likely be placed in the closest security appropriate facility to his home in Vancouver Canada, it is unlikely that any of his family will be able to visit from Canada with any meaningful frequency once he is sentenced.

Due to Mr. Ong status as a deportable alien he will not be eligible for placement in a minimum security facility.  At minimum he will be required to serve his time in the more restrictive conditions present at low security facility. *See* BOP's Program Statement P5100.08, Chapter 5, Public Safety Factors.  Moreover, inmates are normally eligible to spend up to 12 months in a half-way house.  "The Director of the Bureau of Prisons shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months) … Such conditions may include a community correctional facility." 18 U.S.C.A. § 3624.  Due to Mr. Ong's status as a deportable alien he will not be eligible to complete the custody portion of his sentence in a half-way house.  Finally, Mr. Ong will go into ICE custody after he completes his

sentence.  He will remain in ICE custody until he is deported, a process that could take as little as a week, up to several months.

These consequences, which increase the punishment to non-citizens, are an appropriate basis for a reasonable sentence below the guidelines.  Additionally, courts have recognized that below guideline departures are appropriate based on these consequences. See, *U.S. v. Farouil*, 124 F.3d 838 (7th Cir. 1997) (where defendant charged with importing heroin, district court may consider whether defendant status as a deportable alien would result in unusual or exceptional hardship in conditions of confinement that might warrant a departure; ineligible for home detention, community confinement, work release, intermittent incarceration, or minimum security designation); *U.S. v. Pacheco-Soto*, 386 F.Supp.2d 1198, 1205 (D.N.M.2005)(in a drug case where the guideline range was 74 months, a below guideline sentence of 60 months imposed because defendant was a deportable alien who faces a unwarranted increase in the severity of his sentence. "He likely will not be eligible for any early release, he will not be able to serve his sentence in a minimum security prison, and he may not qualify for reduced credits for participation in a residential drug or alcohol abuse program. These consequences are severe and unfair."); *U.S. v. Bakeas*, 987 F.Supp. 44 (D. Mass. 1997) (departure from 12 months to probationary sentence and home confinement

13

for legal resident alien convicted of embezzlement because he was ineligible for minimum security confinement); *U.S. v. Smith*, 27 F.3d 649 (D.C.Cir.1994) (Defendant's status as a deportable alien subjects him to harsher confinement because he is ineligible for benefits of early release (to CTC) and not eligible for minimum security prison; so the court has authority to consider downward departure).

### d. 18 U.S.C. § 3553(a)(2)(B): the need for the sentence imposed to afford adequate deterrence to criminal conduct.

Regardless of the sentence imposed by the Court the almost 15 months that Mr. Ong has already served has been more than sufficient to deter any future criminal conduct.  Incarceration has been a life changing experience for Mr. Ong. He is committed to leading the rest of his life in full compliance with the law.

In addition to the time he will spend in custody, Mr. Ong will be deported to Canada and banned from the United States for life. This is a life sentence in addition to the punishment that a United State's citizen would receive for identical conduct.  Mr. Ong has voluntarily agreed to waive any rights he might have to oppose his deportation from the United States.  A sentence that imprisons Mr. Ong and excludes him from the United States for life is more than adequate to meet the goal of deterring future criminal conduct by Mr. Ong as well as other would be defendants.

### e. 18 U.S.C. § 3553(a)(2)(C): the need for the sentence imposed to protect the public from further crimes of the defendant.

Mr. Ong does not have any prior arrests, charges or convictions, placing him not only in criminal history category I, but making him a true first offender. As such, he is among the category of offenders that present the lowest risk to re-offend. *United States v. Oldani*, 2009 WL 1770116 (S.D.W. Va. June 16, 2009) contains a thorough discussion of the reduced risk of recidivism posed by true first offenders.

> While his placement within criminal history category "I" gives Mr. Oldani a sizeable benefit based on his lack of criminal history, category "I" can be broken down into further classifications with widely varying rates of recidivism: (a) offenders with no prior arrests or convictions; (b) offenders with prior arrests but no prior convictions; (c) offenders with prior convictions that do not count towards criminal history points; (d) offenders with one criminal history point. *See* U.S. Sentencing Commission, Recidivism and the "First Offender", May 2004 *available at* http://www. ussc.gov/publicat/recidivism_firstoffender.pdf.. Based on empirical research, the commission found that a defendant with no prior arrests nor criminal history has only a 6.8 percent chance of recidivism. *Id.* This was the lowest rate of recidivism of any group in the study and sharply lower than the rate of those defendants with prior arrests but no convictions (17.2 percent) or defendants with one criminal history point (22.6 percent). (Defendants with prior convictions that did not count towards a criminal history points had an 8.8 percent rate of recidivism).

*United States v. Oldani*, 2009 WL 1770116 (S.D.W. Va. June 16, 2009)

Mr. Ong's arrest and incarceration, for someone with no exposure whatsoever to the criminal justice system, has been a major life altering experience.  Were the Court to release Mr. Ong into ICE custody today, he would pose little risk, if any, of committing a criminal offense in the future.  Furthermore, at the end of his sentence Mr. Ong will be deported from the United States, further reducing the risk that he would commit a crime in the United States.

### f.   18 U.S.C. § 3553(a)(3): the kinds of sentences available.

A sentence of 21 months, as requested by Mr. Ong, is available to the court.

### g.   18 U.S.C. § 3553(a)(4): the sentencing range established by the guidelines.

The U.S. Sentencing Commission acted outside its "characteristic institutional role" when developing the guidelines for violations of the Arms Export Control Act.  As a result, the guidelines do not sufficiently distinguish between the widely varying degrees of seriousness of conduct covered by § 2M5.2. *United States v. Oldani*, *supra* contains a thorough discussion of this issue.  In *Oldani* the sentencing judge found that the appropriate base offense level for the crime of exporting night-vision optics was 22 rather than the 26 set forth by the guidelines. *Id.*

16

The U.S. Sentencing Commission was tasked by Congress to provide guidelines that meet the sentencing objectives enunciated in 18 U.S.S.G. § 3553(a). *Rita v. U.S.* 551 U.S. 338, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007). In carrying out its mission, "the Commission took an 'empirical approach,' beginning with an empirical examination of 10,000 presentence reports setting forth what judges had done in the past and then modifying and adjusting past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions" etc. *Id.* This empirical approach is the essence of the sentencing commission's "characteristic institutional role" to develop sentences consistent with the purposes of § 3553 without "choos[ing] among differing practical and philosophical objectives." *Rita,* 551 U.S. 338, 127 S.Ct. 2456, 168 L.Ed.2d 203

There are times when the sentencing commission must act outside its characteristic role and suggest guideline ranges based on policy directives rather than on careful empirical research. A prime example of this can be seen in the guideline ranges for drug trafficking offenses. *See Kimbrough v. U.S.,* 552 U.S. 85, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007); …

As it did when it fashioned the guidelines for crack cocaine offenses, the sentencing commission acted outside its characteristic role in establishing the base offense level for Timothy Oldani's crime; …

The U.S. Munitions list includes a broad array of technologies from "riflescopes manufactured to military specifications" to "Ballistic Missiles," "Warships," "Tanks and Military Vehicles," "Chemical Agents," "Biological Agents," and "Nuclear Weapons…the base offense level of 26 within § 2M5.2 applies whether the items exported are night-vision optics, like those at issue here, or nuclear weapons; …

A 2001 Amendment raised the default offense level from 22 to 26 to respond to a "a statutory provision

17

expressing a sense of Congress .... that guideline penalties [were] inadequate for certain offenses involving the importation and exportation of nuclear, chemical, and biological weapons ..." U.S.S.G.App. C amend. 633; …

It is clear, by the divergent set of materials included within and the history and justification for the amendments, that the sentencing commission did not act within its "characteristic institutional role" when it established the current guidelines under § 2M5.2. It would be logical for there to be a sliding scale (such as exists for different drug types and weights) based on the lethal nature or technical sophistication of different munitions: no such scale exists, however. Further, it is clear that the increase in offense level from 22 to 26 was a result, not of empirical study, but a policy directive from Congress; …

The optics are not, however, weapons of mass destruction equivalent to chemical or biological weapons or nuclear material. For this reason the Court has justification to vary from the base offense level of 26 and **FINDS** the appropriate base offense level to be 22: the level at which these items would have been included prior to the 2001 amendments. Retaining a 3-level decrease for acceptance of responsibility, this would place Mr. Oldani at an offense level of 19, or a recommended prison term of 30 to 37 months, prior to consideration of other § 3553 factors.

*United States v. Oldani*, 2009 WL 1770116 (S.D.W. Va. June 16, 2009)

The threat posed to United States security interests by the gun parts which Mr. Ong attempted to export, most of which can be purchased over the internet, pales in comparison to the threat posed by exporting "Ballistic Missiles," "Warships," "Tanks and Military Vehicles," "Chemical Agents," "Biological

Agents," and "Nuclear Weapons".   Moreover these parts were to be sent to Co-Defendant Rivera, someone Mr. Ong believes to be a gun enthusiast.  They were not sent to terrorists or rebels trying to overthrow the government.  The same base level of 26 applies pursuant § 2M5.2 of the guidelines regardless of the seriousness of the underlying conduct.  A reasonable sentence for Mr. Ong under § 3553 must account for the reduced threat posed by Mr. Ong's conduct as compared with other conduct covered by § 2M5.2.

> **h. 18 U.S.C. § 3553(a)(6): the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.**

Other courts, likely recognizing that the guidelines over represent the seriousness of the offense, have sentenced similarly situated defendants to sentences lower than the guidelines recommend for Mr. Ong.  The following examples are paraphrased from press releases found at the U.S. Immigration and Customs Enforcement website at www.ice.gov/news. (Exhibit F)

Timothy Oldani, 24, (*see Oldani, supra*) and Joseph Oldani, 21, were sentenced on June 1, 2009 by United States District Judge Robert C. Chambers, Southern District of West Virginia, to *five months in prison and 21 months in prison*, respectively, for conspiring with each other to steal night vision optics from the U.S. Marine Corps to illegally export them from the United States.  Joseph

Oldani admitted that, while on active duty with the Marines, he stole high-grade night vision optics from his station in Kings Bay, Ga. Joseph admitted he transported the stolen optics to Timothy, who subsequently sold the stolen items on the Internet - mainly on eBay.

David Lee, 41, was sentenced on June 3, 2009 by U.S. District Judge John W. Darrah, Northern District of Illinois, to *two years probation*, with the first six months in home confinement with electronic monitoring for illegally exporting thermal imaging cameras with potential military uses to South Korea without the proper licenses.

Vikramaditya Singh, 34, was sentenced in the District of Delaware on March 2, 2011 *to three years probation, six months' home confinement*, and a $100,000 fine for causing and attempting to cause the export of digital microwave radios to the Islamic Republic of Iran.  On two separate occasions, he knowingly violated U.S. export laws by exporting a pair of microwave radios that he believed were destined for Iran. During an in-person meeting with the agent at his office in Arizona, Singh attempted to sell an additional 40 radios to the agent, which would be shipped through Spain to Iran.

Khalid Ahmed, 37, was sentenced on June 6, 2008 to *five months in prison, followed by five months in community confinement*, a fine of $1,500 and three years

of supervised release for his attempt to export to Sudan components of an assault rifle without the requisite license issued by the U.S. State Department of State. The seizure took place after ICE agents had previously intercepted a package of gun parts sent to Sudan in the mail by Ahmed, after which time ICE agents advised him about the licensing requirements for export, and U.S. sanctions against Sudan. The investigation also revealed that Ahmed had purchased hundreds of export-controlled items, including tactical equipment, gun parts, and other items worth several thousand dollars, which had also been unlawfully exported to Sudan.

### i.  18 U.S.C. § 3553(a): The "parsimony provision"

The "parsimony provision" of 18 U.S.C. § 3553(a) provides that a sentence shall be sufficient, but not greater than necessary, to reflect the *seriousness of the offense*, promote *respect for the law*, provide *just punishment* for the offense, afford *adequate deterrence*, *protect the public* from the defendant, and provide the defendant with *needed care*. A sentence of 21 months is a reasonable sentence and is sufficient to address the purposes set forth in paragraph (2) of 18 U.S.C. § 3553(a). A sentence beyond 21 months would be greater than is necessary to achieve those purposes and would violate to parsimony mandate of 18 U.S.C. § 3553.

WHEREFORE, Mr. Ong respectfully asks this Honorable Court to consider this pleading and its attachments prior to imposing sentence and to sentence Mr. Ong to a sentence of no more than 21 months.

Respectfully Submitted,

s/John A. Garland
John A. Garland
Georgia Bar No. 141226

GARLAND, SAMUEL & LOEB, P.C.
3151 Maple Drive, N.E.
Atlanta, Georgia 30305
404/262-2225
Fax 404/365-5041
jag@gsllaw.com

Counsel for Defendant John Ong

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the within and foregoing SENTENCING MEMORANDUM with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the attorneys of record.

This 12th day of December, 2011.

s/John A. Garland
John A. Garland
Georgia Bar No. 141226